**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION**

**EVERY RICHARDSON**                                                                 **PLAINTIFF**

**v.**                                **No. 5:16-cv-00245 BSM-PSH**

**JASON KELLEY and ESTELLA BLAND**                               **DEFENDANTS**

## PROPOSED FINDINGS AND RECOMMENDATION

## INSTRUCTIONS

The following proposed Findings and Recommendation have been sent to Chief

United States District Judge Brian S. Miller. You may file written objections to all or part

of this recommendation.  If you do so, those objections must: (1) specifically explain the

factual and/or legal basis for your objection, and (2) be received by the Clerk of this Court

within fourteen (14) days of this recommendation.  By not objecting, you may waive the

right to appeal questions of fact.

## DISPOSITION

## I.  Introduction

Plaintiff Every Richardson commenced this case by filing a complaint pursuant to

42 U.S.C. § 1983 (Doc. No. 2).  In the complaint, he alleged that his constitutional rights

were violated because the defendants were deliberately indifferent to his serious medical

needs. He specifically alleged that infected wounds on his right ankle have not been properly treated and his requests for pain medication have largely been ignored. Richardson sues defendants in both their official and individual capacities and seeks both compensatory and punitive damages. *See* Doc. No. 2 at 1 & 3.

Defendants Wendy Kelley and Rory Griffin were previously granted summary judgment. *See* Doc. Nos. 84 & 85. Richardson moved for summary judgment and filed a declaration and statement of undisputed facts in support. *See* Doc. Nos. 81 & 82. The remaining defendants, Jason Kelley and Estella Bland, filed a response asserting that Richardson's motion was premature and asking for additional time to file a response or a cross-motion for summary judgment on the merits. Kelley and Bland subsequently filed a Motion for Summary Judgment along with a supporting brief and statement of facts (Doc. Nos. 87-89). Richardson filed a response, a brief in support, and a statement of disputed facts (Doc. Nos. 91-93). Kelley and Bland filed a reply (Doc. No. 94), and Richardson filed a response to their reply (Doc. No. 95). Having reviewed and considered all the pleadings, and for the reasons stated herein, the Court recommends that Richardson's Motion for Summary Judgment be denied and that defendants' Motion for Summary Judgment be granted.

## II.  Facts[1]

### *Medical Records, Deposition Testimony & Affidavit of Dr. Jeffrey Stieve*[2]

Richardson is 30 years old.  Doc. No. 88-1 at 2.  Richardson has been housed in a single-man cell during the relevant period of time.  Doc. No. 88-3 at 13.  Richardson does not participate in activities or attend yard call.  Doc. No. 88-3 at 23.  Richardson is not diabetic. Doc. No. 88-3 at 20.  Richardson is not hypertensive.  Doc. No. 88-3 at 20.  Richardson has no other significant medical problems other than the bilateral wounds on his ankles.  Doc. No. 88-3 at 20; Doc. No. 88-4 at 2.  Richardson previously filed a similar lawsuit regarding ankle wounds. *See Richardson v. Kelley, et al*, 5:12-cv-00250-BSM at Doc. No. 76 (dismissed on defendants' motion for summary judgment on the merits, where defendants presented expert testimony that Richardson's wounds were intentionally or incidentally contaminated with human feces) (E.D. Ark. April 16, 2014).

---

[1] These facts are taken from Richardson's Undisputed Facts and supporting documents (Doc. No. 82) and the Defendants' Statement of Facts and supporting documents (Doc. No. 88) unless otherwise noted.  The Defendants' argument that Richardson should have filed a more formal statement responding to their undisputed facts is not well-taken.  *See* Defendant's Reply to Response to Motion for Summary Judgment (Doc. No. 94).  The Court liberally construes *pro se* pleadings and accepts the Richardson's statement of disputed facts (Doc. No. 93) as an attempt to dispute certain facts set forth by Defendants.

[2] Kelley and Bland provided the following documentation to support their statement of facts:  Richardson's prison medical records (Doc. No. 88-1); Richardson's medical records from the Arkansas Heart Hospital (Doc. No. 88-2); Richardson's deposition (Doc. No. 88-3); and the Affidavit of Dr. Jeffrey Stieve (Doc. No. 88-4).  Richardson maintains that his deposition testimony is inadmissible because it was taken after the discovery deadline ran.  *See* Doc. No. 91 at 4; Doc. No. 93 at 4-5.  As Defendants point out in their reply (Doc. No. 94), the discovery deadline was extended via text order (Doc. No. 74) and did not run until September  24, 2017.  Richardson's deposition was timely taken on September 12, 2017.

Richardson has been provided a number of different medications for pain related to his bilateral ankle wounds, including salsalate, ibuprofen, nortriptyline, naproxen and gabapentin.  Doc. No. 88-4 at 2; Doc. No. 88-3 at 71.  Richardson maintains that during the relevant period of time for this lawsuit, he was given gabapentin and two ineffective medications along with gabapentin.  Doc. No. 93 at 2.  Richardson also testified that Tylenol is available in the commissary but he did not attempt to purchase it because gabapentin was the only medication which was effective in treating his pain.  Doc. No. 88-3 at 70, 76-77.  However, gabapentin is not indicated for this sort of pain.  Doc. No. 88-4 at 2.  Treatment with gabapentin in this context is an off-label use.  *Id.*  Richardson notes that at least five doctors, including Dr. Stieve, prescribed gabapentin for his pain.  Doc. No. 91 at 5.

Richardson has been provided with a number of diagnostic tests including x-rays (to explore the possibility of osteomyelitis), doppler studies (to explore the possibility of poor circulation), multiple wound cultures (to explore the wound for contamination such as bacteria and to determine which antibiotics may be indicated to treat any such bacterial infection) as well as numerous physical clinical exams.  Doc. No. 88-4 at 2; Doc. No. 88-1.  In addition, Richardson was provided with dressing changes; antibiotics; and other modalities designed to keep the wound clean and aid in healing.  Doc. No. 88-4 at 2-3; Doc. No. 88-1.  Some of the dressing changes and antibiotic treatments were missed as acknowledged in the response to Richardson's grievances (described below).  Richardson

4

was also transported to Little Rock on seven occasions between March 24, 2016, and May 23, 2016, for wound care at the Arkansas Heart Hospital Wound Center. Doc. No. 88-4 at 3; Doc. No. 88-2. Despite the above referenced clinical tests and treatments, Richardson's wounds would repeatedly scab over and heal and then again become open fresh wounds. Doc. No. 88-4 at 3; Doc. No. 88-3 at 18-19. Richardson believes his wounds reopen when his legs swell. Doc. No. 88-3 at 18. He testified that he believed his wounds were almost healed after treatment at the wound clinic because he received a compression dressing there that controlled the swelling. *Id.* at 27.

On various occasions, Richardson refused treatment call. Doc. No. 88-4 at 2; Doc. No. 88-3 at 102-103; Doc. No. 88-1 at 26, 29, 37, 38, 94 & 102. Richardson also refused a Rocephin injection (antibiotics). Doc. No. 88-3 at 103. Richardson testified he may have missed treatments if he was asleep or listening to his radio when the nurse came by. Doc. No. 88-3 at 53. Richardson's medical records reveal that his bandages were often loose, wet or otherwise contaminated. Doc. No. 88-4 at 2; Doc. No. 88-3 at 102-103; Doc. No. 88-1 at 33, 68, 71, 72, 79, 85, 91, 98, 120 & 129. The medical records show, and Richardson testified, that despite medical advice to the contrary, Richardson repeatedly used non-sterile coverings for his wounds, such as brown paper towels, tissues, bed sheets, t-shirts and towels. Doc. No. 88-4 at 3; Doc. No. 88-3 at 62-63. Richardson claims he was forced to do so because he was not provided with appropriate and timely dressing changes. Doc. No. 88-3 at 37, 58 & 63-64. Richardson testified that he is capable of bandaging his

own wounds.  Doc. No. 88-3 at 57 & 59.  Richardson testified that band aids are available on the commissary.  Doc. No. 88-3 at 58.

Dr. Stieve has opined that there is no indication that Richardson has a systemic infection or Dr. Stieve would have expected lesions to develop elsewhere on Richardson's body.  Doc. No. 88-4 at 3.  In Dr. Stieve's professional opinion, Richardson's wounds are the result of either deliberate or incidental contamination.  Doc. No. 88-4 at 3.  As was the case in the previous lawsuit, Richardson admits that E. coli was found in Richardson's wound during the relevant time period.  Doc. No. 88-3 at 65.  He believes the wounds are infected with E. coli while he is taking showers.  *Id.* at 105.  The organisms (bacteria from non-sterile sources) causing infection were recognized, assessed and treated.  Doc. No. 88-4 at 3; Doc. No. 88-1; Doc. No. 88-2. Dr. Stieve opined that continued contamination by Richardson, after appropriate medical advice on sterile processes, had an adverse effect on the expected medical outcome.   Doc. No. 88-4 at 3.

Richardson has no formal medical education or training.  Doc. No. 88-3 at 12. Richardson testified that he does not know who was responsible for treatment call in 2015, but believes that Nurses Boatner and Hargrave were primarily responsible.  Doc. No. 88-3 at 35-36.  Kelley's position with ADC is Health Services Administrator, and he does not typically provide direct patient care.  Doc. No. 88-4 at 1-2; Doc. No. 88-3 at 29-30. Richardson testified that Kelley did not provide him with direct patient care and was not responsible directly for doing dressing changes himself. Doc. No. 88-3 at 29-30.

Richardson testified that he cannot say what should have been done better in his medical case only that medical staff did not do what they were supposed to do. Doc. No. 88-3 at 118-119. It is Dr. Stieve's professional opinion that the medical care and treatment provided to Richardson has been appropriate and satisfactory for Richardson's complaints. Doc. No. 88-4 at 3. Dr. Stieve's conclusion is consistent with sound medical practices and his own professional judgment. *Id.* In Dr. Stieve's opinion, Richardson suffered no damage as a result of the medical care he received during the relevant period of time. Doc. No. 88-4.

### *Richardson's Grievances*[3]

Richardson submitted two grievances in November 2015 complaining about his ankle wound care. Doc. No. 82 at 87 & 91. Richardson specifically complained in Grievance VSM15-5079 that Bland refused to increase his gabapentin prescription from 300 mg to 600 mg. *Id.* at 91. Kelley responded with an outline of the medical care and pain prescriptions Richardson had received and found the grievances to be without merit

---

[3] Richardson's statement of facts (Doc. No. 82) primarily outline the various grievances he filed and the responses by Kelley. He attached copies of those grievances. Those grievances relevant to this case are summarized. Richardson also described and submitted numerous grievances that were not exhausted until after he filed this lawsuit on August 5, 2016. The Court finds those are irrelevant to the claims before it and therefore does not discuss the grievances submitted on or after June 13, 2016. *See* Doc. No. 82 at 8-18, 21-24, 107-118 & 124-175. Further, the Court rejects Richardson's argument that Defendants could not raise exhaustion after the deadline to file a motion for summary judgment based on exhaustion. Exhaustion of administrative remedies is a mandatory requirement under the Prison Litigation Reform Act. *See* 42 U.S.C. §1997e(a); *Jones v. Bock*, 549 U.S. 199, 202 (2007); *Jones v. Norris*, 310 F.3d 610, 612 (8th Cir. 2002).

because Richardson had been adequately treated. *Id.* at 88 & 92. With respect to Richardson's pain prescription, Kelley noted that his 600 mg gabapentin prescription expired July 25, 2015, and that Richardson had been seen four times with no new prescription for gabapentin until Dr. Stieve prescribed 300 mg gabapentin (three times daily) on October 22, 2015. *Id.* at 92. Kelley concluded that Bland did not reduce Richardson's prescription but simply continued the one prescribed by Dr. Stieve. *Id.*

Between November 28, 2015, and February 13, 2016, Richardson submitted 19 grievances complaining that he had not received treatment calls for dressing changes or medications. *Id.* at 2-8; 33-77, 82-86, 95-103.[4] All but one of these grievances were found to be with merit, and Richardson was informed by Kelley numerous times that corrective action would be taken. *Id.* Kelley first responded to grievances submitted between November 28, 2015, and December 3, 2015, on January 4, 2016, stating in part:

> A review of your medical records indicates you did not receive treatment call multiple times from 11/27/15 through 1/4/16. This is unacceptable and will be dealt with by Varner Medical Unit management. Treatment call in VSM

---

[4] Those grievances are: VSM15-5191 submitted on Saturday, November 28, 2015; VSM15-5192 submitted on Sunday, November 29, 2015; VSM15-5239 submitted on Monday, November 30, 2015; VSM15-5313 submitted on Wednesday, December 2, 2015; VSM15-5315 submitted on Thursday, December 3, 2015; VSM15-5452 submitted on Saturday, December 12, 2015; VSM15-5523 submitted on Sunday, December 20, 2015; VSM15-5523 submitted on Friday, December 25, 2015; VSM16-0006 submitted on Sunday, December 27, 2015; VSM16-0122 submitted on Friday, January 1, 2016; VSM16-0123 submitted on Saturday, January 2, 2016; VSM16-0121 submitted on Sunday, January 3, 2016; VSM16-0236 submitted on Saturday, January 9, 2016; VSM16-0235 submitted on Sunday, January 10, 2016; VSM16-0347 submitted on Saturday, January 16, 2016; VSM16-0439 submitted on Sunday, January 31, 2016; VSM16-0542 submitted on Friday, February 5, 2016; VSM16-0614 submitted on Friday, February 12, 2016; and VSM16-0615 submitted on Saturday, February 13, 2016.

is assigned to particular nurses.  The assignment sheets will be reviewed and
corrective action taken.  I find this grievance with merit.

*Id.* at 34, 37, 40, 43, 96.

By the time Kelley responded to these grievances on January 4, 2016, Richardson

had missed 12 treatments.  Kelley responded to a grievance submitted on December 12,

2015, on January 20, 2016, in relevant part:

> A review of your medical records indicates you did not receive treatment call
> on 12/12/15.  This is unacceptable and will be dealt with by Varner Medical
> Unit management.  Treatment call in VSM is assigned to particular nurses.
> The assignment sheets will be reviewed and corrective action taken.  I find
> this grievance with merit.

*Id.* at 46.  Kelley responded to three more grievances on February 1, 2016, stating in

relevant part:

> A review of your medical record indicates you do not have a treatment call
> documented 15 times since December 1st.  Management is aware of the issue
> and measures have been taken to improve on the situation.  If you do not
> receive treatment call on a particular day, please submit a Request for
> Interview to Mr. Kelley, HSA, so management can be immediately aware of
> the situation and corrective action can be taken.  I find this grievance with
> merit due to the fact there are multiple instances of undocumented treatment
> calls.

*Id.* at 49, 52 & 55.  Kelley responded in a similar fashion to two more grievances on

February 8, 2016.  *Id.* at 61 & 64.

On February 16, 2016, after Richardson had filed seven more grievances for missed

treatment calls since Kelley's January 4 responses, Kelley visited Richardson in his cell

along with Nurse Boatner.  Richardson wrote a grievance complaining that despite this

visit, Kelley was doing nothing to correct the inadequate medical care he had been receiving. *Id.* at 104. Kelley responded, in relevant part:

> It has been determined that you have not been receiving treatment call as ordered. That was discussed at your cell on 2/16/16 between you, myself, and Ms. Boatner. We discussed the fact it had been determined the issue seemed to be on the weekends and nursing assignments had been recently changed and more stringent procedure put in place to attempt to resolve this problem. The management team of the medical department has been working with staff to ensure the importance of treatment call being done was understood. The situation has improved greatly since the matter was first brought to management's attention. Your grievances are being addressed and measures are being taken to correct the matter. I find this grievance without merit.

*Id.* at 105.

Kelley subsequently responded to another grievance on February 19, 2016, in relevant part:

> A review of your medical record indicates you have not been receiving treatment call as it has been ordered. The management team is aware of the issue and is working diligently to get it resolved. Your treatment call is being specifically assigned to staff members and those staff will be held accountable for not completing the treatment as assigned. Please submit a request for interview to the HSA so it can be addressed quicker. The grievance process takes time before the grievance is addressed by the HSA. Due to the fact your treatment call has not been performed as ordered. I find this grievance with merit.

*Id.* at 70.

Kelley also responded to a grievance on February 19, 2016, stating in relevant part:

> A review of your medical record indicates you have not been receiving treatment call as it has been ordered. Your dressing changes are not being deliberately denied. The issue of you not getting the dressing changes as ordered happen mostly on the weekends. The management team is aware of

the issue and is working diligently to get it resolved. Your treatment call is being specifically assigned to staff members and those staff will be held accountable for not completing the treatment as assigned. Please submit a request for interview to the HSA so it can be addressed quicker. The grievance process takes time before the grievance is addressed by the HSA. Due to the fact your treatment call has not been performed as ordered. I find this grievance with merit.

*Id.* at 73. Kelley responded to four more grievances between February 29, 2016, and March 21, 2016, finding those with merit. *Id.* at 76, 86, 99 & 102. Again, all of these grievances concerned missed treatments that occurred before February 13, 2016.

In the meantime, Richardson also filed grievances regarding other issues such as appointments, tests, and pain medication.

On December 27, 2015, Richardson wrote grievance VSM16-0005 stating that he had been told by a doctor that he would be seen again in two weeks after he finished oral antibiotics to have another culture performed, but he had not been seen in over two weeks. *Id.* at 57. Kelley responded on February 1, 2016, in relevant part: "A review of your medical record indicates you were seen on 12/14/15 by Mr. Capps for pain medications. There is no mention of following up in 2 weeks after finishing the antibiotics in the documentation. I find this grievance without merit." *Id.* at 59. Richardson appealed, and Rory Griffin responded, in relevant part:

December 9, 2015, Mr. Capps, APN, noted that you were not seen, but that your culture was positive for Acinetobacter and that it was susceptible to Levaquin. Mr. Capps ordered Levaquin 750 mg for 10 days and Gabapentin 300 mg one, three times daily with an expiration date of March 8, 2016. December 14, 215 [sic], you were seen by Mr. Capps who noted you were wanting an increase in your pain medication and that you were being treated

with Levaquin for a positive culture.  Mr. Capps ordered Ibuprofen and
noted, "Finish out antibiotic and culture." According to your electronic
Medication Administration Record, your last dose of Levaquin was
administered on December 20, 2015.  Mr. Capps did not order the culture;
however, he did note it in his plan and his notes were reviewed by a nurse.
January 11, 2016, you were seen by Mr. Capps and he ordered cultures,
which were completed January 12, 2016.

Due to the delay in you having the cultures completed after your Levaquin,
this appeal is with merit, but resolved as you were seen by Mr. Capps and the
cultures were completed.

*Id.* at 59.

On January 28, 2015, Richardson submitted a grievance complaining that despite

receiving culture results indicating an infection and a notice that he would be seen by a

doctor within three working days, he was not seen by the doctor until February 6, 2016,

nine days after he receive the notice.  *Id.* at 78.  The regional ombudsman found the

grievance with merit due to the delay completing Richardson's follow-up but resolved.  *Id.*

at 79.

On February 19, 2016, Richardson submitted a grievance complaining that Bland

told him she would let his current pain medication expire and would not place Richardson

on any pain medication at all.  *Id.* at 119.  Kelley responded:

Your grievance dated 2/19/16 has been received and reviewed to determine
if you are receiving medical care as ordered by providers.  You grieved you
went to see Bland about getting specific dressing change orders and she
refused to tell you what she was going to do and threatened to take you off
your gabapentin.  You state that Bland stated she will let your gabapentin
expire and not put you on any pain medication.  A witness statement from
Bland indicates your allegations are false.  Bland entered dressing change
orders to be done daily as well as a wound consult.  There is no mention of

the need to renew your gabapentin. If you feel you need more pain
medication or want to request a renewal please utilize the sick call process.
I find this grievance without merit.

*Id.* at 120. On February 29, 2016, Richardson submitted two inmate request forms to

Kelley to inform him of Bland's conduct and her statement that she would not give him

any more pain medication. *Id.* at 181-182. Richardson testified that his gabapentin

prescription subsequently expired but was prescribed again by Dr. Capps on March 7. *See*

Doc. No. 88-3 at 75-76. However, Richardson's medical records show that a gabapentin

prescription issued on December 9, 2015, expired March 8, 2016. *See* Doc. No. 88-1 at

47. Richardson received a new gabapentin prescription on March 7, 2016. *Id.* at 87. A

medication administration record indicates that Richardson may have missed one dose of

gabapentin on March 9, 2016. *Id.* at 88.

### *Kelley's Emails*

Richardson's statement of facts also describes certain emails from Kelley that he

obtained through discovery. *See id.* at 19 (citing Doc. No. 80-1). In those emails, Kelley

acknowledged the grievances filed by Richardson and instructed staff to remedy the

problems with missed treatment calls. On January 10, 2016, Kelley wrote:

FYI, if he has not missed any more treatments can you try to get him to stop
at the informal level!

Brenda and Carol Ann, please ensure the treatment call in VSM is clearly
assigned to day shift on weekends like we discussed last week. We need to
make sure they know where the list is on Boatner's cars [sic] too. If we do
not get this under control, we will end up in a lawsuit.

Doc. No. 80-1 at 12.  After receiving an email notifying Kelley that Richardson missed treatment calls on January 9 and 10, Kelley responded, "This has to be addressed."  *Id.*  On January 12, 2016, in response to his staff's reply that she would check on weekends to make sure Richardson received treatments, Kelley responded: "I want disciplinary action taken when it is not done.  Make sure each treatment is clearly assigned to day shift on the weekends and make a set of instructions to be printed out on what EXACTLY has to be done. Thanks!"  *Id.*  On February 1, 2016, Kelley wrote:

> Treatment call in VSM continues to be an issue.  Every Richardson did not get anything done on Sunday (Jarrett I think).  I want a MAR placed in the treatment call book to be signed daily by whomever is assigned to do the treatment.  It is my understanding treatment call is supposed to be done on the Day Shift on the weekends and the VSM pill pass nurse is responsible.  I want it to be CLEAR on the assignment sheet who is responsible for treatments in VSM on Saturday and Sunday and that person will be held accountable for not doing the treatment.  This issue is a top priority and must be fixed ASAP.
>
> Brenda, I want you to audit ALL of the charts that have treatments assigned on Monday and report [t]he findings to me.  Any nurse not performing the treatments as assigned will receive disciplinary action.

*Id.* at 11.  On March 16, 2016, Kelley wrote:

> I just spoke with Shelly on this matter.  I was able to show her where his order says "daily".
>
> I have been aware of Richardson's issue for some time as indicated in the grievances.  The weekends are the only issue and Brenda has been making sure treatments are listed on the assignment sheets and calling up here on weekends to ensure they are completed and documented.
>
> Richardson has a consult for the wound clinic this month and will likely receive specific orders from the wound specialist.

He has a lot of grievances with merit because it was 30 days after the fact that I had been made aware of how bad the situation was. Powell had mentioned a few times there was an issue of treatment call in VSM in the weekends but with the grievance coming to me several weeks after it was written all I can do is play catch up.

*Id.* at 6.

### III.  Standard of Review

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. FED. R. CIV. P. 56(c); *Celotex v. Catrett*, 477 U.S. 317, 321 (1986). When ruling on a motion for summary judgment, the court must view the evidence in a light most favorable to the nonmoving party. *Naucke v. City of Park Hills*, 284 F.3d 923, 927 (8th Cir. 2002). The nonmoving party may not rely on allegations or denials, but must demonstrate the existence of specific facts that create a genuine issue for trial. *Mann v. Yarnell*, 497 F.3d 822, 825 (8th Cir. 2007). The nonmoving party's allegations must be supported by sufficient probative evidence that would permit a finding in his favor on more than mere speculation, conjecture, or fantasy. *Id.* (citations omitted). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case. *Othman v. City of Country Club Hills*, 671 F.3d 672, 675 (8th Cir. 2012). Disputes that are not genuine or that are about facts that are

not material will not preclude summary judgment.  *Sitzes v. City of West Memphis, Ark.*,
606 F.3d 461, 465 (8th Cir. 2010).

## III.  Analysis

Defendants maintain that the undisputed facts show that Richardson has not suffered
an Eighth Amendment violation.  Specifically, they assert that Richardson has no viable
theory of recovery with respect to Kelley and that Richardson's medical records and the
affidavit of Dr. Stieve establishes that Richardson received appropriate medical care for
his complaints.  The Court examines each of Richardson's claims below.

### *Corrective Inaction Claim Against Kelley*

Richardson alleges he did not receive necessary medical treatment for his serious
medical needs, and that Kelley had personal knowledge of these claimed constitutional
violations through the grievance process but did nothing to correct the situation.
Richardson also asserts that Kelley had a duty as supervisor of medical services to
investigate the claimed constitutional violations of the medical care providers, and that his
corrective inaction constituted deliberate indifference to Richardson's serious medical
needs.

While there is no *respondeat superior* liability for § 1983 violations, s*ee Otey v.
Marshall*, 121 F.3d 1150, 1155 (8th Cir. 1997), there are two circumstances in which
supervisors may incur liability for cruel and unusual punishment.  First, a supervisor can
be liable if personally involved in a constitutional violation.  Second, a supervisor can be

liable for corrective inaction that amounts to deliberate indifference or tacit authorization of unconstitutional practices. *Howard v. Adkison,* 887 F.2d 134 (8th Cir. 1989); *Choate v. Lockhart*, 7 F.3d 1370, 1376 (8th Cir. 1993). More specifically, a prison supervisor can be liable if he is aware that an inmate has not received constitutionally adequate medical care, and fails to take corrective action. *See Schaub v. VonWald*, 638 F.3d 905 (8th Cir. 2011). *See also Langford v. Norris,* 614 F.3d 445, 460 (8th Cir. 2010) (even though supervisor was not a physician and did not treat inmates, he had constitutional duty to ensure inmates in his charge received needed medical care).

A review of the evidence submitted by Richardson shows that Kelley did in fact take corrective action in response to Richardson's grievances and that Kelley was not deliberately indifferent to Richardson's medical care. With respect to the first two grievances submitted by Richardson in November 2015, Kelley responded with an outline of what medical treatment Richardson had received and found that Richardson had been adequately treated. *See* Doc. No. 82 at 88 & 92. Because Kelley found no mistreatment, he had no reason to take corrective action at that point. Richardson then submitted 12 grievances regarding missed treatments between November 28, 2015, and January 3, 2016. *See id.* at 33-68, 95-97. Kelley responded to the first five on January 4, 2016, promising to take corrective action. *See id.* at 34, 37, 40, 43, 96. Following Kelley's January 4 response, Richardson missed seven more treatments during January and February, all on Fridays, Saturdays, or Sundays with the last missed treatment falling on February 13, 2016.

*See* footnote 3, *supra*.  On February 16, 2016, after Richardson had filed seven more grievances for the missed treatment calls since Kelley's January 4 responses, Kelley visited Richardson in his cell along with Nurse Boatner to discuss the missed treatments.  In his response to Richardson's grievance regarding this meeting, Kelley informed Richardson that the missed treatments had occurred on the weekends, and that nursing assignments had been recently changed and that a more stringent procedure was put in place to resolve the problem.  *See* Doc. No. 82 at 105.  Richardson did not complain of any missed treatments after this meeting.  In subsequent responses to grievances that had been filed prior to this meeting, Kelley instructed Richardson to request an interview with him to address the missed treatments sooner than the grievance process allowed.  *See id.* at 70, 73, 76 & 86.  Kelley found Richardson's grievances regarding other issues to be without merit, *see id.* at 59 & 120, and accordingly, no corrective action by Kelley was warranted.

Kelley's emails, obtained by Richardson through the discovery process and referenced in his statement of facts, show the actions Kelley took after learning of Richardson's missed treatments.  On January 10, 2016, Kelley instructed staff to ensure the treatment call at VSM was clearly assigned to day shift on the weekends.  *See* Doc. No. 80-1 at 12.  Subsequent emails from Kelley on January 9, 10, and 12 emphasized the need to make sure Richardson received his treatments, with Kelley specifically stating that he wanted disciplinary action taken if Richardson's treatments were not done.  *See id.*  Kelley wrote again on February 1 stating that the issue was "a top priority and must be fixed

ASAP" and that he wanted all charts audited so that any nurse not performing the treatments as assigned could be disciplined. *Id.* at 11. Finally, Richardson explained in his March 16 email that Richardson missed many treatments before Kelley became aware of the problem due to the delay in the grievance procedure – specifically, he stated "it was 30 days after the fact that I had been made aware of how bad the situation was." *Id.* Kelley also outlined what he had done to improve the weekend treatment calls and noted that Richardson had a consult with the wound clinic later that month. *Id.* Richardson was in fact seen by the Arkansas Heart Hospital's wound clinic seven times between March 24, 2016, and May 23, 2016. *See* Doc. No. 88-2.

In sum, once Kelley became aware of the many treatments Richardson had missed between late November 2015 and early January 2016, Richardson missed fewer treatments. He missed some treatments in January and early February on weekends while Kelley worked with nursing staff to ensure that Richardson missed no more treatments. The last missed treatment was on February 13, 2016, and Kelley visited Richardson with Nurse Boatner on February 16, 2016, to discuss new arrangements to ensure Richardson missed no more treatments. The grievances he submitted do not show that he complained of any missed treatments after that date, and he was subsequently sent to the Arkansas Heart Hospital for treatment. These facts do not support a finding that Kelley failed to take corrective action or was deliberately indifferent to Richardson's medical needs.

Additionally, Richardson's medical records and the affidavit of Dr. Stieve[5] show that Richardson's condition was monitored and treated despite the occasional missed dressing changes or missed medications. Accordingly, Kelley is entitled to summary judgment on Richardson's corrective inaction claim.

### Inadequate Medical Care Claim Against Bland

Richardson's claim against Bland is based on her failure to provide the medications he sought and his allegation that she misrepresented that his wounds were healed in June 2016 and canceled his orders to be treated at the wound clinic. *See* Doc. No. 2 at 20-22; Doc. No. 88-3 at 69-78. As stated earlier (footnote 3, *supra*), the June 2016 claim is subject to dismissal because Richardson did not fully exhaust his administrative remedies before filing this suit on August 5, 2016. *See* Doc. No. 82 at 124-127 (appeal response to VSM16-2020 regarding June 6, 2016 encounter with Bland is dated September 19, 2016).

---

[5] Richardson's allegation that Dr. Stieve's affidavit is a "flat-out lie" does not create an issue of fact. "To overcome a motion for summary judgment on the issue of credibility, the nonmoving party must do more than simply attack the credibility of the defendant-affiants." *Brown v. Scherrey*, No. 4:05CV00913 JLH, 2006 WL 3361122, at *4 (E.D. Ark. Nov. 20, 2006) (citing *Lundeen v. Cordner*, 354 F.2d 401, 409 (8th Cir. 1966)). *See also Crawford-El v. Britton,* 523 U.S. 574, 600 (1998) ("[I]f the defendant-official has made a properly supported motion [for summary judgment], the plaintiff may not respond simply with general attacks upon the defendant's credibility, but rather must identify affirmative evidence from which a jury could find that the plaintiff has carried his or her burden . . . ") (footnote omitted). Richardson has produced no affirmative evidence that Dr. Stieve perjured himself. Richardson also acknowledged that he did not understand what "off-label use" meant with respect to Dr. Stieve's statement that gabapentin was an off-label use for pain. Dr. Stieve did not contend that gabapentin was never used for pain, or that he and other doctors did not prescribe it to Richardson for his pain.

Richardson alleges that Bland refused to increase his gabapentin prescription on November 13, 2015, from 300 mg to 600 mg. *See* Doc. No. 82 at 91; Doc. No. 88-3 at 69-72 (Grievance VSM15-5079). In his deposition, Richardson stated that on February 5, 2016, Bland told him she would not prescribe gabapentin any longer because inmates were abusing it. *See* Doc. No. 88-3 at 73. Richardson also alleges that on February 19, 2016, Bland threatened to take him off gabapentin, said that she would let his prescription expire in March, and said that she would not allow him any pain medication at all. *See* Doc. No. 2 at 10 & 20; Doc. No. 82 at 119 (Grievance VSM16-0692); Doc. No. 88-3 at 74-75.

The Eighth Amendment's proscription of cruel and unusual punishment obligates prison officials to provide adequate medical care to inmates in their custody. *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976). To succeed with an inadequate medical care claim, a plaintiff must allege and prove that: (1) he had objectively serious medical needs; and (2) prison officials subjectively knew of, but deliberately disregarded, those serious medical needs. *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997). Additionally, the Eighth Circuit has held that a "prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation." *Estate of Rosenberg by Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir. 1995). *See also Reid v. Griffin*, 808 F.3d 1191, 1192 (8th Cir. 2015) (holding that an inmate's disagreement with "diagnosis and treatment decisions is not actionable under § 1983"); *Popoalii v. Correctional Medical Servs.*, 512 F.3d 488, 499 (8th

Cir. 2008) (disagreement with treatment decisions does not rise to the level of a constitutional violation); *Rowe v. Norris*, 198 Fed. Appx. 579, 580-81 (8th Cir. 2006) (no constitutional violation occurred where plaintiff disagreed with the treatment he received); *Bender v. Regier*, 385 F.3d 1133, 1337 (8th Cir. 2004) (holding that negligence in diagnosis or treatment of medical condition is not sufficient to establish a constitutional violation); *Prater v. Dep't of Corr.*, 11 Fed. Appx. 668, 669 (8th Cir. 2001) (holding that plaintiff failed to establish deliberate indifference where plaintiff did not allege he was "denied, delayed or refused" treatment, only that specific treatment was not provided); *Jolly v. Knudsen,* 205 F.3d 1094, 1096 (8th Cir. 2000) (mere disagreement with the course of medical treatment is insufficient to state Eighth Amendment claim).

Richardson's claim against Bland fails as a matter of law.  He has produced no evidence to support his claims that he was denied pain medication and has not controverted the medical records showing he received pain medication.  Richardson's claim appears to be nothing more than a disagreement as to treatment; however, assuming he needed the gabapentin as the only effective medication for his wound pain, his medical records show that he received it.  He may have liked a higher dose, but several doctors determined that 300 mg three times a day was appropriate.  At no point did Bland reduce his medication or cancel his prescription.  Further, any threat by Bland to do so does not equate a constitutional violation.  Verbal insults or threats generally do not rise to the level of a constitutional violation.  *See Hopson v. Fredericksen,* 961 F.2d 1374, 1378 (8th Cir. 1992).

The only exception to this rule is when a verbal threat rises to the level of a "wanton act of cruelty" such that the inmate is in fear of "instant and unexpected death at the whim of his allegedly bigoted custodians." *Burton v. Livingston,* 791 F.2d 97, 99–100 (8th Cir. 1986). The undisputed facts show that Bland is entitled to summary judgment as a matter of law.

## IV.   Conclusion

For the reasons stated herein, Defendants' Motion for Summary Judgment (Doc. No. 87) should be GRANTED, and plaintiff Every Richardson's Complaint should be DISMISSED WITH PREJUDICE.  Further, Richardson's Motion for Summary Judgment (Doc. No. 81) should be DENIED.  The Court should certify that an *in forma pauperis* appeal taken from the order and judgment dismissing this action would be considered frivolous and not in good faith.

DATED this 19th day of January, 2018.

_____
UNITED STATES MAGISTRATE JUDGE